IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION


| | | |
|---|---|---|
| Jerry Slight | ) | Case No.: |
| Ann Ansel | | |
| Jose Arellano | ) | |
| Barry Bigelow | | |
| Jan Bockert | ) | |
| Joseph Crowe | | |
| Jayme Czerniakowski | ) | JUDGE: |
| Andrew Eubank | | |
| Danyel Garcia | ) | |
| Catrina Geha | | |
| Jill Hunter | ) | |
| Jordan Hurt | | |
| Marco Kelly | ) | |
| Joe Kreutz | | |
| Andrew Nixon | ) | |
| Mark Parker | | COMPLAINT WITH JURY DEMAND |
| David Prysiazny | ) | |
| Robert Ranville | | |
| Robert Richard | ) | |
| Nicholas Ritz | | |
| Reid Robasser | ) | |
| Robert Szydlowski | | |
| Shawn Walker | ) | |
| Anthony Wulf | | |
| Christopher Wulf | ) | |
| Mindy Yeager | | |
| Frank Zimmerman | ) | |
| | | |
| Plaintiffs, | ) | |
| | | |
| | ) | |
| -vs- | | |
| | ) | |
| | | |
| International Union United | ) | |
| Automobile, Aerospace and | | |
| Agricultural Implement | ) | |

1

```
Workers of America              )
8000 East Jefferson Ave.
Detroit, MI  48214              )

and                             )

FCA US, LLC                     )
(formerly Chrysler Group, LLC)
1000 Chrysler Drive             )
Auburn Hills, MI  48326
                                )
and                             )

International Union United
Automobile, Aerospace and       )
Agricultural Implement
Workers of America Region 2B    )
1691 Woodlands Dr.
Maumee, OH 43537                )

and                             )

ALPHONS IACOBELLI               )
1749 Picadilly Court
Rochester Hills, MI 48309       )

                                )
and                             )

JEROME DURDEN                   )
761 Loggers Circle
Rochester, MI 48307             )
                                )
and                             )

MICHAEL BROWN                   )
4402 Gateway Circle, Apt. 16    )
West Bloomfield, MI 48322
                                )
and                             )

DENNIS WILLIAMS                 )
24455 Crestley Dr.
Corona, CA 92883                )

and                             )

GARY JONES                      )
P.O Box 393
Corsicana, TX 75151             )
```

2

```
and                             )

NORWOOD H. JEWELL               )
9261 Star Ct.
Swartz Creek, MI 48473         )

and                             )

VIRDELL KING                   )
15469 Ashton Rd.
Detroit, MI 48223              )

and                             )

NANCY A. JOHNSON               )
5775 Lakeview Street
Detroit, MI 48213              )

and                             )

KEITH MICKENS                  )
16701 Woodingham Dr.
Detroit, MI 48221              )

                                )

JOHN DOE 1-10                  )

                                )

     Defendants.               )
```

<u>INTRODUCTION</u>

1.  This is a "civil RICO" lawsuit filed by numerous employees of FCA US, LLC, who work at the Chrysler Toledo Jeep plant and are members of the United Auto Workers union.  They are suing FCA, the UAW and several individual officials of both organizations for engaging in a pattern of racketeering by conspiring in a bribery scheme to defraud plaintiffs out of wages, benefits and seniority.

2.  This lawsuit arises under 18 U.S.C. Section 1962(c), which makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect,

3

interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity....", and 18 U.S.C. Section 1962 (d), which makes it "unlawful for any person to conspire to violate any of the provisions of subsections (a), (b), or (c) of this section."

3.   At all relevant times, each defendant was a "person" within the meaning of 18 U.S.C. Section 1961(3), because each defendant was "capable of holding a legal or beneficial interest in property."

4.   Defendants operated as, or participated in an enterprises for the common purpose of directing funds away from FCA and others for the benefit of certain UAW officials in return for benefits, concessions and advantages to FCA as alleged herein, and to the detriment of plaintiffs, through fraudulent schemes and a pattern of racketeering activity, as defined in 18 U.S.C. Section 1961(5). They did so by, among other things, illegally manipulating the collective bargaining and grievance processes and diverting funds from the National Training Center and other FCA funds for the benefit of UAW officials.

5.   Each defendant participated in the operation by making decisions on behalf of the enterprise and/or carrying out the decisions of the enterprise, including by directing, authorizing, receiving or concealing improper payments and/or by impacting the collective bargaining and/or grievance processes.  Each defendant committed at least two acts of racketeering activity as identified

4

below; the multiple acts of racketeering activity which defendants committed and/or conspired to, or aided and abetted in the commission of, were related to each other, and were long-running and therefore constitute a "pattern of racketeering activity."


## PARTIES

6.  Plaintiffs are 27 employees of FCA US, LLC (formerly known as Chrysler Group, LLC), and work at the Toledo Jeep plant in Toledo, Ohio, within the Northern District of Ohio.

7.  Defendant FCA US, LLC ("Chrysler") is the successor corporation to Chrysler Group, LLC, and is the employer of all plaintiffs.  FCA US, LLC means, collectively, FCA US, LLC, its parent FCA NV, along with their predecessors, including FCA predecessors, Chrysler LLC and Chrysler Group LLC and FCA NV predecessor Fiat S.p.A.  This defendant will be referenced as Chrysler or FCA. Defendant FCA is located in Auburn Hills, Michigan, but has a plant in Toledo, Ohio, has agents and employees in Toledo and transacts business in Toledo.

8.  Defendant UAW International is a labor organization and the bargaining representative of the employees, including plaintiffs, of Chrysler who work at the Toledo Jeep plant. Defendant UAW International is located in Detroit, Michigan, but has several locals and a regional office in Maumee, Ohio (Region 2B), has numerous agents in Toledo and transacts business in Toledo.

9.    Defendant UAW Region 2B is a labor organization that is located in Maumee, Ohio and is affiliated with, and an agent of defendant UAW International.  Region 2B transacts business with both the International and various UAW locals, including the local with which plaintiffs are affiliated.

10.    Defendants Iacobelli, Durden, Brown, Williams, Jones, Jewell, King, Johnson and Mickens, along with John Does 1-10, were, at all relevant times, officials within either FCA or the UAW who were involved in the criminal conspiracy to defraud plaintiffs by engaging in a bribery scheme. The identities of the John Does could not reasonably be ascertained by plaintiffs but will be identified and properly served as appropriate.

<u>JURISDICTION AND VENUE</u>

11.    This Court has federal question subject matter jurisdiction over this action under 28 U.S.C. Section 1331, and pursuant to the civil RICO statutes, 18 U.S.C. Sections 1962 and 1964. This Court has subject matter jurisdiction over plaintiffs' state law claims as a matter of supplemental jurisdiction under 28 U.S.C. Section 1367.

12.    Venue in this district is proper under 28 U.S.C. Section 1391 because a substantial part of the events and omissions giving rise to the claims occurred in this district, and under 18 U.S.C. Section 1965 because one or more of the defendants have an agent or transact their affairs in this district.

FACTS

13.   Plaintiffs all began working at Chrysler as temporary employees (also known as Temporary Part-Time, or TPTs, or Supplemental Employees) at the Chrysler auto plant in Toledo, Ohio in 2007.  Even though they were supposed to only work Mondays, Fridays and Saturdays, most plaintiffs worked full-time and even overtime for most of the six years they spent as TPTs.  When they started as TPTs, plaintiffs were paid at what later became known as a Tier I wage.  There were about 75 "2007 TPTs."

14.   Pursuant to the collective bargaining agreements between Chrysler and the UAW which were in effect at the time plaintiffs were hired, Chrysler was not supposed to use TPTs as de facto permanent employees in order to avoid full-time pay and benefits; TPTs were not to be hired when the company expected that the job for which those employees were hired would last more than 120 days. The company also was supposed to offer TPTs the opportunity to become permanent employees during the first 119 days of employment if the TPT expressed an interest in becoming a permanent employee and if permanent openings existed.

15.   TPTs were also supposed to be offered full-time employment on a "first-in, first-out method."  When TPTs had to be laid-off, it was supposed to be according to seniority as to when they were first hired.  TPTs were also supposed to receive preferential hiring consideration for permanent, full-time employment.  Any TPT hired full-time was supposed to be given

7

credit for time worked as a TPT toward completion of the mandatory 90-day probation period and satisfaction of a benefits waiting period once that probation period was completed. The seniority date was supposed to be the date hired as a full-time employee after any remaining probationary period.

16. Despite the fact that they should have been hired as permanent employees prior to their 120th day working as TPTs, and despite the fact that they should have been hired based on the "first in, first out" seniority system, plaintiffs were not hired as permanent employees until March, 2013, well after they had worked for more than 120 days each, and after other individuals had been hired as permanent employees ahead of them.

17. Between 2007 and 2013, during which time plaintiffs remained classified as TPTs, despite working well beyond the 120-day limitation and, in many cases, working full-time but not receiving full-time benefits or seniority, plaintiffs were paid at the higher wage level that eventually became known as Tier I.

18. When plaintiffs were hired as permanent employees in March, 2013, their wages were dropped to what had by then become known as Tier II hourly wages, which were approximately $8 to $12 per hour lower than what plaintiffs had been making as temporary employees.

19. Prior to plaintiffs being hired as permanent employees, defendant Chrysler hired approximately 100 employees who had previously worked at a Chrysler parts supplier known as Gonzalez in November, 2012.

8

20.  These Gonzalez workers were hired before plaintiffs, received a better seniority date and many were hired in at a higher rate of pay than plaintiffs, contrary to the applicable collective bargaining agreements.

21.  The failure by Chrysler to hire plaintiffs permanently prior to or even after plaintiffs worked 120 days constituted violations of the Chrysler-UAW collective bargaining agreements.

22.  The failure by Chrysler to hire plaintiffs permanently based on the "first in, first out" seniority system constituted a breach of the CBA by Chrysler.

23.  The hiring of Gonzalez employees by Chrysler ahead of plaintiffs also constituted a breach of the CBA by Chrysler.

24.  When plaintiffs were hired permanently in March, 2013, they were hired in at a new lower hourly wage for new permanent employees that had taken effect in 2011.  Had plaintiffs been hired in permanently prior to when they hit the 120-day mark as they should have been, their wages would have started at a higher level and then escalated from there; the difference between what plaintiffs should have been paid had they been hired at the proper time and what they were paid when they were hired in March, 2013 was approximately $8-$12 per hour for each plaintiff.

25.  In July, 2013, UAW Local 12 and the International UAW filed grievances against Chrysler on behalf of plaintiffs and other similarly-situated 2007 temporary employees.  These two grievances, labeled as Group Grievances and numbered Grievance No. 12-053, "Pay Practices," and Grievance No. 13-054, "Contract Violation," were

9

filed to address the above-listed CBA violations by Chrysler.

26.    On January 31, 2014, the UAW, specifically UAW International representative Troy Davis, withdrew both grievances "without precedent" and the company consented to the withdrawals.

27.    However, the UAW did not tell plaintiffs that the grievances had been withdrawn.

28.    On the contrary, officials from the local, regional and international unions repeatedly told numerous plaintiffs throughout 2014, and made representations at public union meetings throughout 2014 at which numerous plaintiffs were in attendance, that the grievances were still pending and working their way through the system.    Various union officials made blatant and repeated misrepresentations to plaintiffs about the status of the grievances.

29.    It was not until the end of October, 2014 or early November, 2014, that plaintiffs discovered that the grievances had been withdrawn by the union in January, 2014.

30.  When plaintiffs discovered that their grievances had been withdrawn ten (10) months earlier, several of them had discussions and text exchanges with UAW officials at the local, regional and international levels seeking advice on what could be done to remedy the situation.

31.  These officials told the plaintiffs either that there was nothing that could be done because the time limit for appealing the union's withdrawal of the grievances had passed, or that their only remedy was to ask the International to place plaintiffs' issue on

the bargaining table when negotiations for the next CBA came up in 2015.

32.  Taking their union officials at their word and believing that it was too late to file an appeal, plaintiffs did not attempt to file any internal union appeals and instead went directly to federal court.

33.  In April, 2015, a group of TPTs (some of whom are plaintiffs in the instant case) filed suit against Chrysler and the UAW, alleging violations of Section 9(a) of the National Labor Relations Act, 29 U.S.C. Section 159(a) and Section 301 of the Labor Management Relations Act, 29 U.S.C. Section 185. and 28 U.S.C. 1337.  Slight v. UAW, N.D. Ohio Case No. 3:15cv664 ("Slight I").

34.  The UAW and Chrysler sought an order from this Court limiting the scope of discovery to the procedural issues of whether plaintiffs had exhausted their internal union remedies and if not, whether they were legally excused from doing so.  This Court granted that limitation and the parties engaged in limited discovery.

35.  On June 13, 2016, after discovery was conducted on those limited topics, both UAW and Chrysler filed motions for summary judgment, arguing that plaintiffs had failed to exhaust internal remedies and were not excused from doing so.  Plaintiffs filed a response arguing that because they had been misled by their union officials, plaintiffs should be excused from having to exhaust their internal union remedies.

11

36.  On July 24, 2017, this Court granted the motions for summary judgment.

37.  Plaintiffs appealed the decision, and on March 21, 2018, the U.S. Sixth Circuit Court of Appeals issued an order holding in abeyance this Court's ruling to allow the plaintiffs an opportunity to exhaust the UAW's internal remedies.

38.  On April 25, 2018, the plaintiffs began the internal UAW appeal process, but instead of permitting the plaintiffs to proceed on the merits of their appeal, on May 18, 2018, defendant UAW International President Dennis Williams responded by telling plaintiffs that the union regarded the appeal letter as a request for the International President to waive the time limits for filing an appeal.

39.  Plaintiffs submitted documents in support of a request for the UAW to waive time limits, and on December 19, 2018, defendant UAW International President Gary Jones, who had taken over for President Williams, declined to waive the time limits.

40.  Plaintiffs then appealed that ruling to the UAW International Executive Board (IEB) and on May 13, 2019, defendant President Jones informed plaintiffs from Slight I that the IEB had affirmed President Jones' decision.  The IEB decision was unsigned.

41.  The plaintiffs appealed that ruling to the UAW's Public Review Board.

42.  In response to that appeal, President Jones sent a letter to the PRB, on behalf of the IEB, setting forth the reasons that the IEB agreed (after a supposedly-independent review) with

President Jones' decision not to grant a waiver.

43.  On April 2, 2020, the PRB affirmed the decision of the IEB.

44.  This Court reactivated Slight I and on June 1, 2020, both UAW and Chrysler filed motions to dismiss, arguing that by virtue of the PRB's decision affirming the decision of the UAW President finding that the Slight I plaintiffs' request for a waiver of the time limits for filing an appeal of the withdrawal of the grievances, the plaintiffs' case should be dismissed.

45.  On July 1, 2020, plaintiffs filed a response, arguing that the Sixth Circuit ruling anticipated that the plaintiffs would be permitted to exhaust their internal union remedies on their merits and that the union, by declining to allow plaintiffs' appeal to be heard on its merits, had waived the internal remedies.

46.  The motions to dismiss in Slight I are pending.

47.  Unbeknownst to plaintiffs at the time when plaintiffs were hired and had their pay reduced, during the entire time their grievances were pending and then being delayed, withdrawn and then the withdrawal covered up, and during the early phases of Slight I, when the UAW's legal position was that plaintiffs had failed to exhaust internal union remedies prior to filing suit, high-level officials at Chrysler and the UAW were engaging in a wide-ranging, long-lasting criminal bribery scheme aimed at saving Chrysler millions of dollars by having the union take company-friendly positions, i.e., interpreting contractual language in a way that deprived Chrysler employees, like plaintiffs, of pay and seniority,

and derailing the exact type of grievances and lawsuits that plaintiffs were attempting to bring.

48.  Beginning in July, 2009, FCA began this scheme of improper payments to UAW officials, funneled through the Chrysler-UAW National Training Center (NTC), made by FCA senior executives and agents including with the knowledge and approval of then-FCA CEO Sergio Marchionne (now deceased). All such payments were made willfully and with the intent to benefit the UAW and its officials to influence the collective bargaining and/or grievance processes, as alleged herein. FCA and its agents used and directed the use of the mails and wires to further this fraudulent scheme in violation of 18 U.S.C. Section 1341 and 1343.

49.  Also unbeknownst to plaintiffs at the time they filed the original lawsuit and throughout much of the time they prosecuted that lawsuit, the United States Attorney for the Eastern District of Michigan, the FBI and the United States Department of Labor were conducting an investigation into corruption by and between Chrysler and the UAW.

50.  This investigation was first revealed when the first of numerous indictments and plea agreements were publicly revealed in July, 2017, but the fact that UAW and FCA officials had engaged in a bribery scheme was known to FCA and UAW officials as early as 2009, when the scheme began, and the fact that the bribery was being criminally investigated was known to FCA and UAW no later than April, 2016 and was concealed from the plaintiffs.

51.  According to indictments and plea agreements filed in the

bribery scandal criminal cases, starting in approximately July, 2009, Chrysler paid millions of dollars in "prohibited payments and things of value to UAW officers and UAW employees" through the UAW-FCA joint training center and in return, received "benefits, concessions, and advantages for FCA in the negotiation, implementation, and administration of the collective bargaining agreements between FCA and the UAW."

52. These payments were "viewed...as an investment in 'relationship building' with UAW Vice President [General] Holiefield," according to the indictment of Alphons Iacobelli, the Vice President of Employee Relations at Chrysler at the time of the bribery scandal. U.S. v. Iacobelli, E.D. Mich., Case No. 17-20406, Docket #4 at 13.

53. On January 22, 2018, Iacobelli pleaded guilty to paying $1.5 million in bribes to several UAW officials in exchange for those officials going easy on the company in union contracts and grievances. This guilty plea, along with guilty pleas by several UAW officials, is part of an ongoing FBI and U.S. Department of Labor corruption investigation of the "big three" automakers and the UAW, corruption that has potentially victimized tens of thousands of innocent UAW members, including the plaintiffs in this case.

54. Specifically, Iacobelli pleaded guilty to criminal charges involving conspiracy to violate the Labor Management Relations Act, 18 U.S.C. Section 371. Iacobelli was the Vice President for Employee Relations at FCA. In that capacity, he was

"FCA's lead representative for labor relations and had lead responsibility for managing FCA's relationship with the UAW. Alphons Iacobelli was the senior FCA official responsible for negotiating with the UAW and for administering the collective bargaining agreements between FCA and the UAW, including the resolution of disputes and grievances that arose under the collective bargaining agreements between FCA and the UAW," according to his plea agreement.

55.  Iacobelli admitted that "[b]etween in or before January 2009 and continuing through in or after June 2015, Alphons Iacobelli knowingly and voluntarily joined a conspiracy in which Fiat Chrysler Automobiles US LLC and its executives agreed to pay and deliver, and willfully paid and delivered, more than $1.5 million in prohibited payments and things of value to officers and employees of the UAW."  U.S. v. Iacobelli, Plea Agreement at 3.

56.  These bribes were authorized by FCA's then CEO Sergio Marchionne (now deceased) to General Holiefield, the UAW Vice President and International Executive Board Member (now deceased) who oversaw the FCA business relationship.  FCA executive Iacobelli has admitted to this scheme and currently is in prison for these illegal acts.  Michael Brown, Director of Employee Relations at FCA and Co-Director of the National Training Center, likewise has admitted to this scheme.

57.  According to the plea agreement, over the course of the conspiracy, Iacobelli, along with an unnamed FCA Director, an unnamed FCA Senior Manager, FCA Financial Analyst Jerome Durden and

16

other FCA executives and employees, unlawfully paid and delivered more than $1.5 million in prohibited payments and things of value directly and indirectly to UAW Vice President General Holifield, UAW Assistant Director Virdell King, three unnamed UAW officials "and other UAW officials." U.S. v. Iacobelli, Docket #58, Iacobelli Plea Agreement at 6.

58. Those payments and things of value included paying off the mortgage on the personal residence of a UAW Vice President, personal travel, designer clothing, cases of custom-labeled wine, furniture, jewelry, and custom-made watches. Iacobelli Plea Agreement at 6. These and other payments described in the plea agreement were delivered to UAW officials and UAW employees "in an effort to obtain benefits, concessions, and advantages for FCA in the negotiation, implementation, and administration of the collective bargaining agreements between FCA and the UAW." Plea Agreement at 7.

59. According to the Iacoballi indictment, FCA and its executives, with the knowledge and approval of FCA NV, made these payments to keep UAW officials "fat, dumb, and happy" and to "buy labor peace." Iacobelli Indictment at 16.

60. According to federal prosecutors, "FCA, through Iacobelli and its executives, was implementing a corporate policy to buy good relationships with UAW officials. As one FCA executive put it, FCA was making an 'investment,' by 'spending thousands here,' in the form of illegal payments to UAW officials through the National Training Center, in an effort to obtain benefits, concessions, and

17

advantages for FCA in its relationship with the UAW." Iacobelli Gov't Sentencing Mem., Docket #132 at 8.

61. As Michael Brown, FCA's Director of Employee Relations and NTC Co-Director admitted, "it was the intent of FCA executives to 'grease the skids' in their relationship with UAW officials." Brown Plea Agreement, at 4.

62. To minimize detection of the payments, FCA had the NTC provide the bribes to various UAW officials through a variety of deceptive means and methods. The bribes violated the Taft-Hartley Act, 29 U.S.C. Section 186 and were concealed through acts of mail and wire fraud, all constituting predicate acts of racketeering within the meaning of 18 U.S.C. Section 1961(1).

63. For example, UAW Vice President Holifield used his personal charity, Leave the Light on Foundation (LTLOF), as one means to conceal his receipt of FCA bribes. Between July, 2009 and 2014, Holiefield and his hand-selected LTLOF board members (which included defendant FCA executive Jerome Durden and defendants UAW officials Keith Mickens and Virdell King) transferred more than $386,000 in funds from the NTC to LTLOF. Holiefield and his team hid these transfers by improperly omitting them from the Form 990s the NTC and LTLOF filed with the IRS. In turn Holiefield, along with his girlfriend (and later wife), Monica Morgan, used the purported charitable donations for personal expenditures.

64. On other occasions, the NTC would directly pay the personal expenses of certain UAW officials, such as a wire transfer from the NTC that paid off the mortgage on Holiefield's personal

18

residence in the amount of $262,219.71.

65.  FCA also made use of credit cards issued to UAW officials, with statements sent through the U.S. mails and payments made in part using interstate wires, so that UAW officials could charge personal expenses that were paid by FCA.  Iacobelli "directed the NTC to follow 'liberal' credit card and expense policies to persuade union officials to take company-friendly positions," according to the Virdell King Information (at 11).

66.  By information and belief, among the "company-friendly positions" that the UAW and its officials took in exchange for receiving bribes from FCA was the UAW's handling of plaintiffs' pay and benefits and seniority status, grievances, internal inquiries, lawsuit and internal appeals.

67.  Starting in 2013, unbeknownst to plaintiffs, various UAW officials, both in Toledo at UAW Region 2B and at the UAW International in Detroit, were responsible for reclassifying plaintiffs into a Tier II pay and benefits structure, delaying the processing of plaintiffs' grievances, misrepresenting the status of those grievances to plaintiffs, then withdrawing plaintiffs' group grievances, then delaying notifying plaintiffs of the withdrawal of their grievances and then fighting plaintiffs' efforts to have the grievances reinstated.

68.  Defendant Norwood Jewell was a member of the UAW Executive Board from 2011 to 2017, most recently as UAW's vice president of the FCA Department beginning in June, 2014 until 2017 and previously as a Regional Director (2010-2014), and co-chair of

the National Training Center.

69.  By information and belief, Jewell acquiesced in allowing plaintiffs to be reclassified as Tier II employees in 2013, then oversaw or was directly responsible for the other adverse decisions made against plaintiffs thereafter.

70.  In early 2015, after Troy Davis, a servicing rep for the International, had withdrawn plaintiffs' grievances, several plaintiffs met directly with Norwood Jewell in Toledo to find out what had happened to their grievances and what could be done about the situation, either by way of appeal or by placing the request for plaintiffs to be given an earlier seniority date and higher pay onto the agenda for negotiations for the 2105 CBA.  Jewell told plaintiffs he would look into it, but never got back to plaintiffs.

71.  Jewell later admitted under oath that between 2014 and 2016 he joined the conspiracy whereby UAW officials accepted things of value from FCA executives acting in the interest of FCA.  He admitted that as part of that conspiracy, executives from FCA made prohibited payments of things of value, including travel, lodging and meals, delivered through and concealed by the National Training Center, with the intent to benefit the UAW, other senior UAW officials or himself when the UAW, the other UAW officials and Jewell were not lawfully allowed to accept such things of value under the Labor Management Relations Act.

72.  Jewell admitted in his Plea Agreement that between 2009 and 2016, during which time General Holiefield (2009-2014) and he (2014-2016) were the vice presidents of the UAW in charge of the

Chrysler Department,

> FCA executives conspired with one another, with FCA, with officials at the UAW, and with the UAW, to violate the Labor Management Relations Act....[They] knowingly created and/or joined the conspiracy whereby officers and employees of the UAW would willfully request, receive and accept money and things of value from persons acting in the interest of FCA. During the Holifield leadership years, a 'culture of corruption' was continued and enhanced between Holiefield, his staff, and executives of FCA to violate the Labor Management Relations Act....From 2014 through 2016, while serving as a vice president of the UAW in charge of the Chrysler Department, Norwood Jewell knowingly joined the conspiracy whereby officers and employees of the UAW would willfully request, receive and accept things of value worth over $40,000 from persons acting in the interest of FCA by failing to apportion the amounts attributable to the UAW, the NTC, and to Norwood Jewell personally.  The things of value included travel, lodging and meals....Norwood Jewell, then a representative, officer and vice president of the UAW, knowingly and voluntarily joined this conspiracy to receive things of value from persons acting in the interest of FCA. Norwood Jewell joined knowing that the prohibited payments of things of value, which were delivered through and concealed by the UAW-Chrysler National Training Center (NTC), were willfully made with the intent to benefit the UAW, Norwood Jewell, senior UAW official Nancy A. Johnson senior UAW official Virdell King, Keith Mickens, and other senior UAW officials, who were not permitted to receive things of value.

> U.S. v. Jewell, E.D. Mich. Case No. 2:19-cr-20146, Docket #10, Rule 11 Plea Agreement at 2-4.

73.  According to the United States Attorney's Sentencing Memorandum in Jewell's case, Jewell "made the conscious and criminal decision to participate in the conspiracy and to bask in

the culture of corruption."

74.  Norwood Jewell pleaded guilty to one count of conspiracy to violate the Labor Management Relations Act, in violation of 18 U.S.C. Section 371, and was sentenced to fifteen (15) months in prison in 2019. The overt acts for which he pleaded guilty were occurring at the exact same time that he was overseeing the reclassification of plaintiffs into Tier II status and the withdrawal of the plaintiffs' grievances and its aftermath, including meeting directly with several plaintiffs under the guise of putting their issue on the bargaining table for the 2015 CBA negotiations with FCA. In reality he was accepting bribes at that time, the purpose of which was to do FCA's bidding in regards to grievance handling and contract negotiations, rather than doing the bidding of plaintiffs and other UAW members.

75.  The issues raised by plaintiffs, which UAW officials encouraged plaintiffs to bring to the attention of UAW bargaining unit officials and which plaintiffs raised directly to Jewell in early 2015, were not a part of the 2015 CBA and, by information and belief, were not even raised by the UAW bargaining committee to FCA during negotiations.  This was all in furtherance of the bribery scheme and the pattern of racketeering to which Jewell and other UAW officials were parties.

76.  In the meantime, on July 14, 2015, at the kickoff of the 2015 CBA negotiations, Jewell used a National Training Center credit card, paid for by FCA, to pay more than $7500 for an extravagant meal at a Detroit restaurant for himself and the UAW

national negotiating committee. That same day, Jewell caused another $800 of FCA money to be spent for UAW officials to smoke cigars and drink liquor at the same restaurant.

77. In September, 2015, after the completion of the 2015 CBA negotiations, at which plaintiffs' seniority and back pay issues were not raised, Jewell caused another $7000 or so of FCA money to be spent at the same Detroit restaurant for Jewell and the UAW negotiating team to celebrate the new CBA with FCA. During the time period of 2014-2016, when the UAW was shutting down plaintiffs' grievances and fighting them at every step in their attempts to have their seniority and back pay grievances heard and remediated, Jewell was continuing the "culture of corruption" started by Holiefield by accepting bribes from FCA, and funneling meals, travel, alcohol and other things of value to other UAW officials, all to the detriment of plaintiffs and as part of the conspiracy by FCA and UAW and their officials to benefit FCA at the direct expense of plaintiffs, who were the intended targets of the scheme.

78. Jewell further enriched himself with FCA money, with FCA's knowledge and encouragement, when he repeatedly used a credit card and funds provided to him as Co-Chairman of th NTC to make extravagant purchases for the benefit of himself and other high-ranking UAW officials, in violation of 29 U.S.C. Section 186.

79. Such purchases included $8,926.93 for a two-month stay at a villa in Palm Springs, California in January and February, 2016; $6,681.12 for golf, golf club rentals, golf balls, meals, beer, and

23

liquor at the Indian Canyons Golf Resort in Palm Springs; $1,259.17 for luxury luggage; $2,182 for an Italian-made Baretta shotgun; and $468.86 for cigars at Wild Bill's Tobacco store. These purchases also included $2,130 of Disney World theme park tickets for his friend and his friend's family; multiple tickets to Universal Studios theme park for his friends at a cost of $217.26 each; and numerous extravagant dinners for himself and other UAW officials.

80.  FCA not only bought the acquiescence of individual UAW officials like Holiefield and Jewell; FCA also bought the entire UAW International Executive Board at a time when the IEB and/or individual members of the IEB, had the opportunity to make judgments on plaintiffs' grievances or the procedural aftermath of those grievances.

81.  For example, in August, 2014, when plaintiffs' grievances had already been withdrawn but during the ten months when plaintiffs had not yet been notified of the withdrawal of the grievances, Jewell hosted two lavish parties on the grounds of the National Training Center.

82.  Jewell caused more than $25,000 of FCA money to be used for a decadent party to entertain the members of the IEB, including Regional Directors, other Vice Presidents and then-UAW president Dennis Williams, who was the individual ultimately responsible for the actions taken by the UAW that went against plaintiffs' interests.

83.  During that party, each attendee received personalized bottles of wine, with a label that read, "MADE ESPECIALLY FOR YOU

BY UAW VICE PRESIDENT NORWOOD JEWELL IN THE USA." These bottles of wine, as well as other costs of the party, were paid for by FCA.

84. In August, 2015, which was after plaintiffs had filed the Complaint in Slight I in April, 2015 which named both FCA and UAW as defendants, and just one month before the UAW announced to the Slight I Court that it intended to challenge the Slight I plaintiffs on exhaustion grounds, Jewell hosted another party for the IEB on FCA's tab. This party was even more lavish than the 2014 party and had a "Miami Vice" theme and cost more than $31,000. This party featured "Kandy Girls," who were dressed in provocative outfits and whose role was to light the cigars of UAW bosses.

85. As the U.S. Attorney said in Jewell's sentencing memorandum:

> Jewell accepted money generously supplied by the car company with whom he was negotiating a collective bargaining agreement that would affect the wages, benefits, and working conditions of tens of thousands of workers. Rather than conduct those negotiations at arm's length, Jewell's arms were reaching towards the deep pockets of Fiat Chrysler....Jewell was not focused on zealously representing the interests of UAW members and their families. Instead, while thousands of UAW members worked hard every day at factories, Jewell was living the absolute high life in Palm Springs for extended periods of time in January and February of 2015 and 2016. Jewell golfed during the day and ate prime steaks at top restaurants during the night, all while living in a three-bedroom villa with a private pool and hot tub. Of course, Jewell's high-flying lifestyle was paid for by Fiat Chrysler with money funneled through the National Training Center. Jewell also used Fiat Chrysler money to send his close friends to Disney World, fly first class, and acquire brand new luggage. As for the UAW members on the factory line across the

25

country, their day-to-day concerns and grievances were far from Jewell's mind.

U.S. v. Jewell, E.D. Mich. Case No. 2:19-cr-20146, Docket #15, Government Sentencing Memorandum at 15-16.

86. It was during this exact time frame that Jewell met with several of the plaintiffs, who had been told by UAW officials in Toledo to meet with Jewell to discuss having their pay and seniority issues placed on the bargaining table for the 2015 CBA negotiations.

87. In between golf outings in Palm Springs and lavish parties in Detroit, during which time he was bought and paid for by Chrysler, Jewell met with several of the plaintiffs under the guise of being a high-level union official who was supposedly going to use his position of authority in the union that was plaintiffs' sole representative, to attempt to right a wrong for plaintiffs in negotiations with Chrysler.

88. Instead, he buried their grievance and their claim and then ran off to have his cigar lit by a Kandy Girl.

89. The same can be said of the other defendants and of the other bargaining issues affected by the bribes. As the U.S. Attorney said in Jewell's Sentencing Memorandum: "These men and women believed that their union leaders were looking out for their best interests and negotiating in good faith, not double dealing them for personal gain. Through their involvement in this criminal conspiracy, however, Jewell and other senior UAW leaders were accepting corrupt payments from Fiat Chrysler and its executives.

It is difficult to calculate the harm that resulted to the grievance process, the bargaining process, and labor relations generally." U.S. v. Jewell, Govt. Sentencing Memorandum at 17.

90.  The plea agreement of Iacobelli acknowledges that his involvement in the bribery conspiracy lasted until June, 2015, by which time plaintiffs' grievances had already been withdrawn, the notification to plaintiffs of the withdrawal had already been delayed ten (10) months, plaintiffs had already been told (falsely) that it was too late to file an appeal, plaintiffs had already filed suit (Slight I) in U.S. District Court, and defendant UAW was in the process of deciding to challenge plaintiffs' lawsuit on the grounds of failure to exhaust.

91.  Moreover, the Jewell plea agreement acknowledges that the bribery conspiracy lasted until the end of 2016, and other evidence indicates the bribery conspiracy lasted well into 2017, by which time plaintiffs had already conducted numerous depositions of UAW officials without knowing of the existence of a bribery conspiracy or a federal investigation into said conspiracy; and defendant UAW had already filed a motion for summary judgment on the issue of exhaustion (June 13, 2016), again, without mentioning that high-level UAW and FCA officials had been engaged in a bribery scandal that may have affected the union's handling of plaintiffs' claims.

92.  The summary judgment motions by UAW and FCA were pending until the motions were granted on July 24, 2017, during which time UAW officials knew about the bribery scheme and knew about the federal bribery investigation and yet failed to notify plaintiffs

of a bribery scheme or a pending federal bribery investigation that would have affected plaintiffs' case.

93.   Throughout the time frame of 2013-2017, when plaintiffs were denied their seniority and proper pay, when they grieved these denials, when they complained to union officials about the amount of time it was taking for their grievances to be heard (including the time frame when the grievances had already been withdrawn by UAW but plaintiffs had not been notified), when their grievances were withdrawn, when they complained about the withdrawal of their grievances, when they were told (falsely) that the time for an internal union appeal had run out, when they filed a federal lawsuit, when the union and FCA fought that lawsuit, when the union responded to plaintiffs' discovery requests, when union officials sat for depositions, when the union and FCA filed motions for summary judgment, when the Court granted summary judgment; throughout all of these events over a four-year period, the defendants failed to disclose that the union's positions relative to plaintiffs' claims were, at least in part, purchased through and/or influenced by bribes.  The ongoing concealments were part and parcel of the defendants' ongoing conspiracy and racketeering enterprise.

94.   As a result of these bribes, the union defendants were compromised and were never in a position to fully and fairly represent plaintiffs' interests as they were legally required to do, and plaintiffs were not able to receive the benefit of the true and honest union representation to which they were entitled.

95.  Moreover, by virtue of the fact that the bribery scheme was intended to save FCA money and has, at least to this point, been successful at doing so,  and that the money saved came at the expense of the plaintiffs, who have been deprived of their rightful pay, benefits and seniority, plaintiffs were the primary targets of the illegal bribery scheme and the bribery scheme was the proximate cause of plaintiffs' losses.

96.  Each and every one of the defendants participated in or had knowledge of the bribery scheme and larger conspiracy and/or the federal investigation into the bribery scheme and therefore are responsible as co-conspirators.  Each of the individual defendants (with the exception of defendant Williams who has not yet been charged or convicted, but who has resigned his position as President of the International UAW and has been identified in court documents as having knowledge and participation in the bribery scheme) has admitted to having knowledge of and/or participation in the bribery scheme.

97.  As the U.S. Attorney's office said in the Sentencing Memorandum of Nancy Johnson, Norwood Jewell's top administrative assistant, who pleaded guilty to one count of conspiracy to violate the Labor Management Relations Act, 18 U.S.C. Section 371: "Instead of zealously pursuing union grievances and health and safety issues, senior officials of the UAW sought to line their own pockets with money and things of value provided to them by Fiat Chrysler."

98.  At every stage of plaintiffs' case, when both the UAW and

29

Chrysler were making decisions that were adverse to plaintiffs, Chrysler was paying and the UAW was accepting bribes to assure that the UAW would take "company friendly positions," which is exactly what happened to plaintiffs. Each of the defendants, both the corporate defendants and the individual defendants, took part in or at least knew about the bribery scheme and its goal of inducing the union to take company-friendly positions on CBA negotiations and the handling of grievances.

99. During the time frame of plaintiffs' grievances and appeals, the International Presidents of the UAW were Dennis Williams and then Gary Jones.

100. Williams was UAW President from 2014 to June, 2018 and he was replaced by Jones, who was president from June, 2018 to November, 2019.

101. On June, 2, 2020, Jones pleaded guilty to racketeering and embezzlement charges, and is awaiting sentencing. Williams has not been charged criminally but his home has been the subject of a raid by the FBI.

102. According to the indictment of UAW official Vance Pearson, Williams was directly involved in the bribery conspiracy, in that he rented a villa in Palm Springs, California, ostensibly for the UAW's Region 5 Conference, from on or about December 25, 2014 to January 31, 2015. During that time, upon information and belief, Williams participated in or was aware of Chrysler/FCA funds being used for lavish dinners and golf outings for UAW officials in Palm Springs, including dinners and other expenditures during

January, 2015.

103.  In June, 2018, Gary Jones took over as union president and was the UAW official who refused to permit plaintiffs to proceed with their appeal of the UAW's withdrawal of their grievances after the Sixth Circuit permitted the plaintiffs to exhaust their internal appeals.  By information and belief, Jones' decision not to waive the timeliness provisions of the UAW Constitution, and not to reveal to plaintiffs the existence of the bribery scheme and/or the federal investigation into the bribery scheme, was influenced by his knowledge of, and participation in the bribery scheme.

104.  During the entire time frame between 2013 and 2018, high-level officials from both the UAW and FCA, acting on behalf of their respective organizations, knew that bribes were being paid and received or had previously been paid and received in order to obtain labor peace, at the expense of plaintiffs and other UAW members.

105.  During this same time frame and even later, both FCA and the UAW knew that the plaintiffs had been wrongfully reclassified into Tier II status upon hiring, had filed grievances, had had those grievances withdrawn one step before arbitration, had not been notified until ten months after the fact that the grievances had been withdrawn, had been told by UAW officials that it was too late to file an internal appeal, had filed suit in federal court, had had that lawsuit dismissed on the grounds that they had failed to exhaust their internal remedies, had filed an appeal, had had

the district court case re-opened so that internal appeals could be exhausted and had had those internal appeals challenged and eventually rebuffed on the basis of timeliness.

106. It was the UAW International President (Gary Jones) and the International Executive Board of the UAW that had signed off on the refusal to hear plaintiffs' appeal on its merits.

107. Almost all of these events occurred during the same time period when FCA was paying bribes to the UAW to buy labor peace and to influence labor contracts and grievances or in the aftermath of UAW officials having received those payments. Plaintiffs, among others, were the intended targets of the bribery scheme. Some of these events occurred after FCA and the UAW were informed that their organizations and high-level individuals within their organizations were under investigation for bribery. Yet, as part of the conspiracy, neither FCA nor the UAW nor any of the individual defendants informed plaintiffs of the investigation or that the actions of FCA and the UAW in fighting plaintiffs' claims for the last eight years had been influenced by payments and acceptance of bribes.

108. As a direct result of this conspiracy of silence, plaintiffs, in addition to having been unlawfully reclassified as Tier II employees when hired, were not able to fully pursue either their grievances, the withdrawal of their grievances or their lawsuit, to plaintiffs' detriment and prejudice.

109. By information and belief, UAW and FCA leaders knew as early as October, 2015, that the federal government was actively

investigating past FCA/UAW CBAs and labor agreements. Plaintiffs had no such knowledge because FCA, UAW and its leaders, as part of the conspiracy, concealed both the fact of the bribes and the fact that the union and the company and high-level officials from the union and the company were being investigated, from the plaintiffs and their counsel. All of the union's actions and the company's actions in Slight I, including all of the union's actions pre-suit and during the lawsuit, are tainted by the bribery of union officials by company officials.

110. Even though plaintiffs disagreed with the decisions made by the UAW in relation to their claims, they reasonably but incorrectly believed that FCA and the UAW and their officials acted in good faith and at arm's length.

111. Secrecy and concealment of the bribery scheme were vital to its' success. Had defendants revealed the existence of the bribery scheme to plaintiffs (or to anyone), it would have resulted in criminal indictments much earlier than was eventually the case, and it would have afforded plaintiffs the opportunity, in Slight I, to have more fully explored the extent to which the bribes were influencing the defendants' decisions in Slight I, both before and during the actual litigation of that case.

112. Instead, defendants, as part of the conspiracy, took active measures to conceal the existence of the bribes, including but not limited to, failing to reveal the existence of the bribery scheme and the federal investigation into the bribery scheme during all phases of Slight I. This ongoing conspiracy of concealment was

successful, in that plaintiffs in <u>Slight I</u> went through the entire grievance process, the discussions with union officials about the withdrawal of the grievances, the lawsuit, the discovery phase of the lawsuit (which was limited to the issue of exhaustion), and the appeal of the dismissal of the lawsuit before the first public acknowledgment was made by the federal government (not the defendants) of the existence of the bribery investigation and scheme.

113. Even when the first federal indictments were made public in July, 2017, FCA and the UAW continued to take active steps to conceal and minimize the scheme. In 2017 and 2018, FCA and UAW President Williams issued public statements downplaying the federal indictments and attributing the bribes to a few "bad actors."

114. The public statements of UAW and FCA continued to claim that FCA and UAW were victims and that neither the company nor the union knew of or sanctioned the criminal acts alleged and further, that the illegal conduct of these "bad actors" had nothing to do with the collective bargaining process.

115. In fact, both UAW and FCA had been aware of the criminal acts, both because their highest-level executives were participating in the conspiracies and because by July, 2017, both the company and the union had known about the federal investigations for at least two years prior to the announcement of the first set of indictments in July, 2017. And both FCA and the UAW knew that the bribes had a direct effect on the collective bargaining process, including the handling of plaintiffs'

34

grievances and lawsuit, because that was what the bribes were
specifically intended to affect.

116. Plaintiffs could not have reasonably discovered this
information earlier, because of defendants' ongoing effort to
conceal the existence of the bribery scheme.

117. Had plaintiffs been successful in their grievances, the
company would have had to pay millions of dollars in back pay and
higher wages going forward to plaintiffs and other similarly-
situated TPTs. The grievances had been deemed meritorious in the
first steps of internal union review, and then suddenly and without
explanation, when the grievances were just one step away from
arbitration, the grievances were withdrawn by the union without
explanation and informing the plaintiffs for about ten months.

118. The withdrawal of the grievances, which saved the
company millions of dollars, is just the kind of company-friendly
positions that the Iacobelli bribes were intended to purchase.

119. By information and belief, the withdrawing of
plaintiffs' grievances, despite the fact that several union
officials believed the grievances were meritorious, the mis-
direction by union officials of plaintiffs to induce plaintiffs not
to file internal union appeals, as well as the union's on-going
attempts to thwart plaintiffs' attempts to seek redress, both
through the courts and through union procedures, was done for
corrupt purposes as part of the conspiracy that began in 2009.

120. Since the Iacobelli plea agreement was made public,
numerous other FCA and UAW officials have been indicted and/or

pleaded guilty to charges stemming from the same or other bribery schemes.

121.  For example, Jerome Durden, who was a financial analyst at Chrysler and FCA and who was Controller of the NTC and Secretary of the NTC Joint Activities Board and Treasurer of General Holiefield's Leave the Light on Foundation until 2015, pleaded guilty on August 8, 2018 to failure to file tax returns, 26 U.S.C. Section 7203, and conspiracy to defraud the U.S., 18 U.S.C. Section 371 for acts related to the bribery scheme, and was sentenced to 15 months in prison.

122.  Michael Brown was the Director of Employee Relations at Chrysler and FCA from 2009 to 2016.  In that capacity, by information and belief, Brown was personally involved in the negotiations and administration of the national CBAs between Chrysler/FCA and the UAW and had authority to sign letters and agreements on behalf of Chrysler/FCA with the UAW.  Brown also represented Chrysler and FCA as Co-Director of the NTC.  On May 25, 2018, Brown pleaded guilty to misprision of a felony, 18 U.S.C. Section 4 for his role in the bribery scheme, and was sentenced to one year and one day in prison.

123.  Norwood Jewell served on the UAW's executive board from 2011 to 2017, including serving as UAW's Vice President of the FCA Department from 2014-2017.  He also served as Co-Chairman of the NTC.  On April 2, 2019, Jewell pleaded guilty to conspiracy to violate the Labor Management Relations Act, 18 U.S.C. Section 371 for his role in the bribery scheme and was sentenced to fifteen

(15) months in prison.

124.  Virdell King was a senior official in the UAW Chrysler Department from 2008 until she retired in February, 2016.  On August 29, 2017, she pleaded guilty to conspiracy to violate the Labor Management Relations Act, 18 U.S.C. Section 371 for her role in the bribery scheme and was sentenced to sixty (60) days in prison.

125.  Nancy Johnson was the top administrative assistant to Norwood Jewell when Jewell was the UAW Vice President for the Chrysler Department, from 2014-2016.  On July 23, 2018, Johnson pleaded guilty to conspiracy to violate the Labor Management Relations Act, 18 U.S.C. Section 371 for her role in the bribery scheme, and was sentenced to one year and one day in prison.

126.  Keith Mickens was a senior official in the UAW Chrysler Department from 2010 through 2015.  Mickens served as Co-Chairman of the NTC and served on the NTC Joint Activities Board.  On April 5, 2018, Mickens pleaded guilty to conspiracy to violate the Labor Management Relations Act, 18 U.S.C. Section 271 for his role in the bribery scheme, and was sentenced to one year and one day in prison.

127.  Former UAW International President Gary Jones pleaded guilty on June 3, 2020 to one count of conspiracy to embezzle union funds and to use facilities of interstate commerce to aid racketeering activity, and  conspiracy to defraud the United States, in an embezzlement scheme that is only partially related to the bribery scheme described above.  Jones has yet to be sentenced.

128.   Former UAW International President Dennis Williams has been implicated in the embezzlement scheme relative to Gary Jones' conviction and also the bribery scheme, but he has not yet been charged.

129.  Some of the details of the bribery scheme, including the identities of some of the participants and the specific quid pro quos that were involved, have not yet become public through the criminal bribery cases and cannot currently be ascertained by plaintiff except through discovery.

130.  Based on what has become public so far, for almost a decade, FCA, the UAW and the individual defendants, as well as others as yet unknown, engaged in a classic pattern of racketeering, including committing multiple violations of bribery, wire fraud and mail fraud statutes.

<u>COUNT I</u>

<u>Civil RICO, 18 U.S.C. Section 1962(c) and (d) and 18 U.S.C.</u>
<u>Section 1964(a), (c) and (d)</u>

131.  Plaintiffs reassert the foregoing as if fully rewritten herein.

132.  The conduct of all defendants, in authorizing, paying, collecting or concealing improper payments and/or bribes, and/or by impacting the collective bargaining and/or grievance processes, constitutes a pattern of racketeering activity.  Each defendant, acting in concert with one or more of the other defendants, committed at least two acts of racketeering activity as identified

38

above and in defendants' criminal charges, pleas and sentences; the multiple acts of racketeering activity which defendants committed and/or conspired to, or aided and abetted in the commission of, were related to each other, were long-running and in violation of 18 U.S.C. Section 1962 (c) and (d) and 18 U.S.C. Section 1964 (a), (c) and (d).

133. Plaintiffs' injuries and damages were directly and proximately caused by defendants' racketeering activities. As a direct and proximate result of defendants' activities, plaintiffs suffered and continue to suffer loss of seniority, loss of income and loss of benefits, and other compensatory damages, for which the defendants, jointly and severally, are liable to plaintiffs for treble damages plus interest, punitive damages and attorneys' fees.

COUNT II

Civil Conspiracy (Federal)

134. Plaintiffs reassert the foregoing as if fully rewritten herein.

135. The conduct of all defendants, acting in concert with each other for the purpose of manipulating the collective bargaining and grievance processes, through concerted action to accomplish a criminal or unlawful purpose and/or to accomplish a lawful purpose by criminal or unlawful means, constitutes a civil conspiracy, under federal law.

136. As a direct result of the actions and conduct of the defendants, plaintiffs suffered and continue to suffer loss of pay,

loss of seniority, loss of retirement benefits and other job benefits, and other compensatory damages.

### COUNT III

#### Civil Conspiracy (State of Ohio law)

137.  Plaintiffs reassert the foregoing as if fully rewritten herein.

138.  The conduct of all defendants, acting in concert with each other for the purpose of manipulating the collective bargaining and grievance processes, through concerted action to accomplish a criminal or unlawful purpose and/or to accomplish a lawful purpose by criminal or unlawful means, constitutes a civil conspiracy, under Ohio law.

139.  As a direct result of the actions and conduct of the union defendants, plaintiffs suffered and continue to suffer loss of income and benefits, loss of seniority, loss of retirement benefits, and other compensatory damages.

WHEREFORE, plaintiffs ask that this court grant the following relief:

> A.  Declare that the acts and conduct of all defendants constitute violations of plaintiff's statutory and common-law rights;

> B.  Enjoin defendants from violating the statutory and common-law rights of the plaintiffs;

> C.  Order the Chrysler defendant to reinstate all plaintiffs to their "Tier I" permanent positions and pay status, with corresponding increases in pay and benefits, retroactive to

their contractually-mandated eligibility dates, along with seniority retroactive to the date when their seniority should have begun;

D.  Grant to the plaintiffs and against all defendants, jointly and severally, an appropriate amount of compensatory damages, including treble damages;

E.  Grant to the plaintiffs and against all defendants, jointly and severally, an appropriate amount of punitive and/or exemplary damages;

F.  Grant to the plaintiffs and against all defendants, jointly and severally, appropriate costs and attorneys' fees.

G.  Grant to the plaintiffs whatever other relief the Court deems appropriate.

/s/Kenneth D. Myers
KENNETH D. MYERS [0053655]
6100 Oak Tree Blvd., Suite 200
Cleveland, OH  44131
(216) 241-3900
kdmy@aol.com

Counsel for All Plaintiffs

<u>JURY DEMAND</u>

Plaintiffs hereby demand a trial by jury.

/s/Kenneth D. Myers
KENNETH D. MYERS

Counsel for All Plaintiffs